IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned On Briefs May 7, 2009

**IN THE MATTER OF: A.L.B, d/o/b 09/06/1998, M.L.B., Jr., d/o/b 12/24/2000, and M.L. B., d/o/b 04/19/2002**

**Direct Appeal from the Juvenile Court for Shelby County**
**No. P2010     Herbert J. Lane, Special Judge**

_____

**No. W2008-02696-COA-R3-PT - June 30, 2009**
_____

Father appeals the trial court's judgment terminating his parental rights. The trial court found that the father had committed severe child abuse, that the father failed to comply with the obligations and responsibilities outlined in the permanency plans, and that conditions which led to the removal of the children still persisted. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which HOLLY M. KIRBY, J. and J. STEVEN STAFFORD, J., joined.

W. Ray Glasgow, Memphis, Tennessee, for the Appellant, M.L.B., Sr.

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General, and Jill Z. Grim, Assistant Attorney General, for the Appellee, State of Tennessee, Department of Children's Services.

**OPINION**

**Background/Procedural History**

This cases involves the termination of parental rights regarding three children, A.L.B., born September 6, 1998, M.L.B., born December 24, 2000, and M.L.B., born April 19, 2002 (collectively "the children"). On August 22, 2003, the children's maternal grandmother petitioned the court for custody of the three children alleging that their mother, S.D.C. ("Mother"), was a substance abuser about to be incarcerated and was unable to provide adequate care or supervision for the children. On January 21, 2004, the children's paternal grandmother intervened and eventually the three children were placed with her. On January 11, 2007, however, the Tennessee Department of Children's Services ("DCS") filed a petition to modify the protective custody order. The petition to modify alleged that the children were dependent and neglected and sought that the children be placed with the state.

The basis upon which DCS filed the petition to modify custody was the sexual abuse of A.L.B. The state presented proof at trial that on January 10, 2007, A.L.B complained at school that it was painful to use the restroom. A.L.B. was referred to a guidance counselor, who discovered that A.L.B. had sores around her vagina. The guidance counselor reported the condition to DCS and the Memphis Police Department. A.L.B. alleged that a family friend sexually abused her while her mother watched. The trial court found that Mother accepted money from the perpetrator. The children's father, M.L.B., Sr. ("Father") admitted that A.L.B. previously told him about the abuse. Father told DCS that he and Mother got into an argument over the abuse, but he did not approach authorities over the situation because he was afraid of going back to jail.[1] Father did not, however, prohibit Mother from taking the kids after he learned of the abuse. At the time of the initial custody hearing Mother had been criminally charged with facilitating the rape of a child. After the hearing, she pled guilty and is currently serving eight years in prison.

On May 30, 2007, the juvenile court judge adopted the findings and recommendations of the juvenile referee and determined that the children were dependent and neglected. Among other things, the juvenile referee found that Mother, Father, the children's maternal grandmother, and the paternal grandmother committed severe child abuse as it is defined in Tennessee Code Annotated Section 37-1-102(b)(21)(C). As to Father, the juvenile referee found the following:

> That the father's failure to protect his children appears to be the result of his diminutive [sic] mental capacity and use of drugs and his reliance on advice from other family members rather than from a mental depravity on his part. As such it may be appropriate to allow supervised visitation for him with said children; however, any plan to restore to him custody should be based upon a sound mental and social examination by experts and a plan which protects said children from any unsupervised contact with other family members . . . .

> That in working with the father the Tennessee Department of Children's Services needs to take into account his refusal to believe his daughter's allegations of sexual abuse by other family members. Whether or not these allegations are true, they created a legitimate ground for protection which the father fails to recognize. Additionally, the father acknowledges [his] inability to pass a drug test due to his use of marijuana.

The trial court recommended that the children be placed in the custody of DCS and that DCS be prohibited from placing the children with any of Mother or Father's relatives. The court also appointed a special advocate to conduct an investigation.

While Mother was incarcerated, DCS entered into two permanency plans with Father. The first plan, dated January 26, 2007, required Father to find stable housing, a stable income, complete an alcohol and drug assessment, and attend therapy to address the children's abuse and anger

---

[1]Father indicated that the perpetrator was with the sheriff's office in some capacity.

management.  DCS entered another parenting plan with Father on February 7, 2008.  Father was to complete the following tasks: supervised visitation, family therapy, alcohol and drug assessment, mental health evaluation, and obtain financial means to support his children.  Father signed both plans, and initially exhibited a willingness to comply with the terms of the parenting plans.  Monica Gray ("Ms. Gray"), a family services worker with DCS, testified that Father was originally involved with the children's education through Youth Villages, where he participated in most of the sessions held at school.  Ms. Gray also noted on the February 7, 2008 permanency plan that Father was involved with the children's education, that he was seeking employment, that he was enthusiastic, and that his disciplinary style was good and worked for the children.

Father has not, however, completely complied with the terms of either parenting plan.  Father never attended an alcohol and drug assessment; he was not employed at the time of the hearing and lived at that time with a female friend of his in a one or two bedroom apartment with three other children.  Father also continued his relationship with Mother even after Mother was arrested for facilitating the rape of his own child.[2]  Both Father and the paternal grandmother had stated that they knew that the abuse was occurring but could not explain why they did not report it.

On April 10, 2008, DCS filed a petition to terminate Mother and Father's parental rights.  At the trial, Ms. Gray testified that DCS referred Father to LeBonheur's Center for Child and Parents CCP ("CCP"), South Memphis Alliance, innovative counseling, and Branches of Life for employment referrals.  Ms. Gray testified that although Father has taken advantage of DCS' introductory services, he had not completed the CCP evaluation or South Memphis Alliance; nor did Father attend innovative counseling or obtain stable housing or employment.  Ms. Gray testified that DCS did not treat Father as though he had a mentally diminished capacity because there was no proof that he actually had a diminished capacity.  She also testified that DCS did not help Father learn any job skills and it did not make any efforts to house Father because Father claimed that he could obtain housing.  Branches of Life referred Father to several different places for employment.  Father contacted these employers but was still unable to find employment.

Denise Higgins ("Ms. Higgins") testified that she was the court appointed special advocate.  She testified that she conducted a home study at the paternal grandmother's house because that was where Father resided at the time.  She had to call three or four times to schedule a visitation.  After Ms. Higgins explained her role to Father, he failed to even warn her that there was a female smoking in his bedroom, and when they went in "[the unclothed female] was laying on the bed like, 'Here I am.'"  Once Father moved into his own home, Ms. Higgins had a difficult time getting the address from him.  Eventually, the paternal grandmother took Ms. Higgins to the address, which was different than the one that Father had given her.  There was no furniture in the house, and the lights were not on; it was simply a bare house.  Father explained to her that he did not intend to move in

---

[2]Authorities arrested Father for indecent exposure after they discovered Father and Mother masturbating in the jail while Mother was incarcerated and awaiting trial on the facilitation of the rape of a child charges.  Father claims that his relationship with Mother has since ceased.

to the house physically until he had custody of the children. The paternal grandmother confirmed this.

Father had told Ms. Higgins several times that he had job interviews. She called once to speak to the paternal grandmother during the time she had been told Father had a job interview, and Father answered the phone. Ms. Gray testified that Father only worked one temporary job for probably around three-months. In 2007 and 2008, every time Ms. Higgins went to Youth Villages on the date that Father told her that he was scheduled to have visitation with the children, Father never came.

Father testified, on his own behalf, opposing the termination of his parental rights. He stated that he found out that his daughter was being abused while he was incarcerated. When he was released around June 16, 2005, he confronted Mother, and he testified that he did not think that the abuse continued. Father testified that he worked with Priority Placement at Hershey's from August to December, but he was laid off when Hershey's dropped the contract. Father testified that he is currently living in his own home and that he did not furnish the home because Ms. Gray told him that DCS would provide furniture for the house if he gained custody of the children. He testified that he attended the CCP evaluation program and the fatherhood program, and went to Branches of Life, but he never received notice to return for any further requirements.

Father also testified that he has four other children. He is paying $185 a month in child support for one child. He pays approximately $500.00 a month in rent. Father testified that he is no longer using drugs. He stated that he quit smoking marijuana approximately 4 months prior to the court proceedings, and that he does not drink at all. Father admitted that he does smoke approximately 2 packs of cigarettes a week. Father has not, however, undergone any drug assessment to confirm this testimony. Father also testified that he has been earning money under the table stocking and he works temporary jobs through Labor Ready and that he buys food stamps from someone. Father explained that he generally visited the children twice a month from January up until June, but he admitted that from June until October there was a four month gap when he did not visit the children because he had a newborn baby.

The only proof as to the children's current condition came from Ms. Gray. She testified that the children have been in state custody since DCS filed for a modification in custody on January 10, 2007, and they are currently in a Youth Villages foster home. She explained that the children are doing well in foster care, and DCS is in the process of identifying an adoptive placement for the children.

After trial, the juvenile court entered an order terminating both parents' parental rights on October 27, 2008. The court found by clear and convincing evidence that Father and Mother committed severe child abuse against A.L.B. The trial court also found by clear and convincing evidence that Father failed to comply with the obligations and responsibilities outlined in the permanency plans, that the children have been in the custody of DCS for more than six months, and that the conditions which led to the children's removal still persist or other conditions persist which

in all probability would cause the children to be subjected to further abuse and neglect. As are pertinent to Father's appeal, the court made the following additional findings:

12. Pursuant to T.C.A. § 36-1-113(g)(2), [Father] failed to comply with the obligations and responsibilities outlined in the permanency plans, though said obligations and responsibilities were ratified by the Court as reasonable and related to the reasons necessitating foster care. Monica Gray, [a Department of Child Services Family Services worker] testified as to the creation, goal and requirements of the initial permanency plans for the children developed on January 26, 2007 and February 7, 2008 that required the father to attend all visitations; obtain an alcohol and drug assessment and mental health evaluation; and achieve financial stability. The Department made reasonable efforts to assist the father when the children entered custody by referring the father to Le Bonheur Center for Children and Parents; Innovative Counseling; Branches of Life; and South Memphis Alliance. The father signed the permanency plans in agreement and signed the termination of parental rights criteria. Nevertheless, the [Father] failed to comply with the permanency plans in that, among other things, he failed to complete the CCP evaluation or alcohol and drug treatment, and he failed to obtain financial stability. The father attended therapy with Greg Motley, Branches of Life; however, Mr. Motley recommended that the children not be placed with the father until he obtained employment and proper housing, physical and sexual abuse training, alcohol and drug training, parenting education, anger management training, financial management, and personal hygiene training. . . .

13. Pursuant to T.C.A. § 36-1-113(g)(3)(a), [the children] have been in the custody of the State of Tennessee, Department of Children's Services for more than six (6) months preceding the filing of this petition, and the conditions which led to removal still persist and other conditions exist which in all probability would cause the children to be subjected to further abuse and neglect and which, therefore, prevent the children's return to the care of Respondent [Father]. Further, there is little likelihood that these conditions will be remedied at an early date so that the children can be safely returned to Respondent in the near future; the continuation of the legal parent and child relationship greatly diminishes the children's chances of early integration into a safe, stable and permanent home; and continuation of the legal parent and child relationship is not in said children's best interest. Said Respondent has not made such a lasting adjustment as to enable the children to be returned to him safely. Conditions exist in that the Court found in May 2007 that the Respondent [Father] failed to protect the children as a result of his diminutive mental capacity, drug use and dependence on family; the father still does not have stable housing and financial stability; he failed to complete a mental health evaluation or alcohol and drug treatment; and he was involved in a relationship with [Mother] at least until November 2007, though he knew she was incarcerated for facilitating the rape of their child.

14. Pursuant to T.C.A. §36-1-113(i)(1)-(7), termination of parental rights is in the best interest of [the children] in that Respondents [Mother] and [Father] have failed to make such an adjustment of circumstance[s], conduct, or conditions as to make it safe and in the children's best interest to be in their homes, despite reasonable efforts by available social service agencies for such duration of time that lasting adjustment does not appear reasonably possible; and a change of caretakers and physical environment is likely to have a traumatic effect on the children's emotional and physical condition. Respondent [Mother] is currently incarcerated for a period of eight years for facilitation of rape and facilitation of rape of a child, against her child [A.B.]; she committed brutal sexual abuse toward the child by permitting Wayne Logan to sexually abuse the child, her daughter, and accepting payment for this abuse. [Father] knew of this abuse and failed to protect the child. [Father] continued to visit and engage in an unlawful physical relationship with [Mother] at least until November 2007, though he knew she was incarcerated for facilitating the rape of his own child, [A.B.]. . . . [Father] has been arrested and convicted numerous times for theft and other crimes. . . . [Father's] use of controlled substances would be detrimental to the children and prevent him from effectively providing safe and stable care and supervision for the children. The children are in a home with Charles and Mildred Truesdale, with whom the children have bonded. Denise Higgins, Court-Appointed Special Advocate, testified that, based on her investigation of the family and the circumstances that brought the children into custody, the children should not be returned to the family, and it is in the best interest of the children to be adopted.

### *Issues*

As stated in his brief, Father raises the following two issues on appeal:

I.      Whether there was clear and convincing evidence that conditions that led to the removal of the children from the home persisted as of the time of the filing of the termination petition.

II.     Whether the evidence presented to the trial court established by clear and convincing evidence that termination of Father's parental rights was in the best interest of the children.

The Tennessee Department of Children's Services (DCS) phrases the issues on appeal as follows:

I.      Whether the juvenile court properly concluded that [Father] severely abused his child by failing to protect her.

II.       Whether the juvenile [court] properly concluded that [Father] was in substantial noncompliance with the reasonable obligations of his permanency plans.

III.     Whether the juvenile court properly concluded that [Father] failed to remedy the persistent conditions in his life that prevented his children's return.

IV.     Whether the juvenile court properly concluded that termination of [Father's] parental rights was in the best interest of the children.

### *Standard of Review*

To deprive a parent of his or her fundamental right to the custody of his or her child, the State must prove that there is a statutory ground for terminating the parent's rights and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(2005). The existence of any statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005). Whether a ground for termination has been proved by the requisite standard of proof is a question of law that we review *de novo* with no presumption of correctness. *In re S.M.R. and K. M.R.*, No. M2008-01221-COA-R3-PT, 2008 WL 4949236, at *5 (Tenn. Ct. App. Nov. 18, 2008)(*no perm. app. filed*). A trial court must find that there are statutory grounds for removal by clear and convincing evidence. *In re M.L.D.*, 182 S.W.3d at 894. To be clear and convincing, the evidence must eliminate any substantial doubt and produce a firm conviction as to truth in the fact finder's's mind. *Id.* Although the clear and convincing standard evidence standard is more exacting than the preponderance of the evidence standard, it does not demand the certainty required by the beyond a reasonable doubt standard of review. *Id.*

In analyzing the lower court's judgment terminating Father's parental rights, we review the trial court's decision *de novo* upon the record and presume the correctness of the trial court's factual findings. Tenn. R. App. P. 13(d); *Fowler v. Wilbanks*, 48 S.W.3d 738, 740 (Tenn. Ct. App. 2000). We will not reverse the trial court's factual findings unless they are contrary to the preponderance of the evidence. *Berryhill v. Rhodes*, 21 S.W.3d 188, 190 (Tenn. 2000). If the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). If the trial court fails to make findings of fact, however, our review is *de novo* with no presumption of correctness. *Archer v. Archer*, 907 S.W.2d 412, 416 (Tenn. Ct. App.1995). On the other hand, we review the trial court's application of law *de novo* with no presumption of correctness. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). Similarly, we review mixed questions of law and fact *de novo*, with no presumption of correctness. *State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005).

*Analysis*

Tennessee Code Annotated Section 36-1-113 governs the termination of parental rights. It provides that a trial court may terminate parental rights if it finds that termination is in the best interest of the child and that, by clear and convincing evidence, any of the following grounds for termination exist:

> (2)  There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;
>
> (3)  The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> > (A)  The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> >
> > (B)  There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> >
> > (C)  The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;
>
> (4)  The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian[.]

Tenn. Code Ann. §§ 36-1-113(g) (Supp. 2008).  In this case, the trial court terminated Father's parental rights on the basis that it found clear and convincing evidence of all three of the above-mentioned statutory grounds.

## A. Failure to Remedy Persistent Conditions

On appeal, Father argues that there was not clear and convincing evidence that conditions that led to the removal of the children from the home persisted at the time that DCS filed the termination petition.  We note, foremost, that the trial court terminated Father's parental rights on three separate grounds.  To support a parental termination, however, there need be only one statutory ground for termination, so long as it has been proven by clear and convincing evidence. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).  In this case, however, the trial court found that Father had committed severe child abuse, failed to substantially comply with the parenting plan

obligations, and that the children had been in the state's custody for more than six months and that conditions existed which prevented the children from being returned to Father's care. The trial court's finding that Father had severely abused A.L.B. and that he had failed to substantially comply with the obligations and responsibilities outlined in the parenting plan would, therefore, be sufficient grounds upon which to terminate his parental rights, and Father does not appeal these issues.

Nevertheless, Father argues that the conditions that brought the children into DCS's custody no longer existed at the time that the termination petition was filed. Father makes two distinct arguments. First, he contends that the initial grounds for removing the children from their parents' custody was A.L.B.'s sexual abuse, and that because Mother and the perpetrator of the abuse have since been incarcerated, that those conditions no longer exist. Second, Father argues that DCS failed to make reasonable efforts to reunite the family by failing to take into consideration Father's "diminutive" mental capacity. We address each of these arguments below.

### i. Persistent Conditions

Father argues that the persistent conditions that led to the removal of the children no longer exist. Nevertheless, Tennessee law permits the termination of parental rights where

> [t]he child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and;
>> (A) The conditions that led to the child's removal **or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardians(s), still persist** . . . .

Tenn. Code. Ann. § 36-1-113(g)(3)(Supp. 2008) (emphasis added). The trial court may, therefore, terminate parental rights if any conditions persist that would cause the child to be subject to further abuse or neglect. In this case, the trial court found that Father initially failed to protect his children. At the time of the hearing, the trial court found that Father was not financially stable and did not have stable housing. Father had not completed alcohol and drug treatment, and still maintained a relationship with Mother at least as late as November 2007 even though Father knew that Mother was incarcerated for facilitating the rape of their child.

Father admitted at trial that his job prospects were merely hopeful, and not definite.[3] He admitted to his relationship with Mother while she was incarcerated, and he admitted that he had not moved into his own living space yet and did not have furniture. Upon a thorough review of the record, we find that there is clear and convincing evidence of conditions that it is reasonably probable would cause the children to be subjected to further abuse and neglect and that, therefore, prevent the children's return to Father's care. It was not necessary that the trial court find that the same condition persisted as for which the children were originally removed from Father's care.

### ii. Reasonable Efforts to Reunite the Family

Father also argues that, in light of his "diminutive mental capacity," DCS failed to make reasonable efforts to reunite the family. Before terminating parental rights, the court must find that "[r]easonable efforts have been made to prevent the need for removal of the child from such child's family or to make it possible for the child to return home." Tenn. Code. Ann. § 37-1-166(d)(2)(2005). Once DCS undertakes to reunify a family, we employ the clear and convincing standard to determine whether DCS's efforts have been reasonable. *In re J.L.E.*, No. M2004-02133-COA-R3-PT, 2005 WL 1541862, at *12 (Tenn. Ct. App. June 30, 2005). Our legislature has defined reasonable efforts as "the exercise of reasonable care and diligence by [DCS] to provide services related to meeting the needs of the child and the family," although the child's health and safety is the paramount concern. Tenn. Code. Ann. § 37-1-166(g)(1)(2005). The factors we consider when determining whether DCS has made reasonable efforts include, among others, the reasons for separating the parent from the child, the parent's physical and mental abilities, the resources available to the parent, and the parent's efforts to remedy the situation, and the duration of the parent's remedial efforts. *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 (Tenn. Ct. App. Mar. 9, 2004).

> "Reasonable efforts entail more than simply providing parents with a list of service providers and sending them on their way. The Department's employees must use their superior insight and training to assist parents with the problems the Department has identified in the permanency plan, whether the parents ask for

---

[3]The following exchange occurred at trial:

Q. And where have you worked in 2008?
A. This year?
Q. Yes.
A. Nowhere, not a steady job.
Q. Other than the one that you're doing, the stocking under the table?
A. Shop and Save.
Q. So you think you'll get a job? If the children were returned to you, you would have a job?
A. Hopefully, yes. Yes.
Q. Hopefully, but not for sure?
A. I mean, I guess.

assistance or not."  The Department is not required to make "Herculean" efforts, however, and "the remedial responsibility does not rest solely on the Department's shoulders."  Parents also are required to "make reasonable efforts to rehabilitate themselves and to remedy the conditions that required them to be separated from their children."

*In re T.L.N.*, No. M2008-011510COA-R3-PT, 2009 WL 152544, at *6 (Tenn. Ct. App. Jan. 21, 2008) (*no perm. app. filed*) (quoting *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 (Tenn. Ct. App. Mar. 9, 2004)) (internal citations omitted).

DCS is not required to make reasonable efforts to reunite the family, however, where a parent has subjected the child or another child residing in the home to aggravated circumstances. Tenn. Code Ann. § 37-1-166(g)(4)(A).  Such circumstances include abandonment, abandonment of an infant, aggravated assault, aggravated kidnapping, especially aggravated kidnapping, aggravated child abuse and neglect, aggravated sexual exploitation of a minor, especially aggravated sexual exploitation of a minor, aggravated rape, rape, rape of a child, incest, or severe child abuse, as defined at Tennessee Code Annotated Section 37-1-102.  Tenn. Code. Ann. § 36-1-102(9); *see In re C.M.M.*, 2004 WL 438326, at *6 n.19.  Once again, we emphasize, that the trial court terminated Father's parental rights on multiple grounds.  One of these grounds was "severe child abuse."  In this case, we find no merit to Father's argument that DCS was required to make reasonable efforts to reunite the family.

### B. Best Interest of the Children

Once the trial court has found that grounds exist for the termination of parental rights, the trial court must also find that termination is in the best interest of the child.  Tennessee Code Annotated provides a list of non-exclusive factors for the trial court to consider:

> (1)  Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2)  Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3)  Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4)  Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5)  The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6)  Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or

psychological abuse, or neglect toward the child, or another child or adult in the family or household;

       (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care fo the child in a safe and stable manner;

       (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

       (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i)(Supp 2008). In determining whether termination is in the best interest of the child the trial court must look to the child's, not the parent's, perspective. *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005). The trial court found that Father continued to visit and engage in a physical relationship with Mother until at least November 2007 even though he knew she was incarcerated for facilitating the rape of his own child. In addition, Father has been arrested and convicted numerous times for theft and other crimes, and his use of controlled substances would be detrimental to the children and prevent him from effectively providing safe and stable care and supervision for the children. The trial court also found that a change of caretakers and physical environment is likely to have a traumatic effect on the children's emotional and physical condition, and that the children have bonded with their current caretakers. In addition, we note that Father admitted that he failed to visit the children for four consecutive months and that at the time of trial nearly twenty-two months had passed from the time that the children were taken into the custody of the state. Considering the listed statutory factors and the entire record, we find that the trial court properly determined that termination was in the best interest of the children.

### *Conclusion*

     For the foregoing reasons, we affirm the juvenile court's judgment terminating Father's parental rights. Costs of this appeal are assessed to the Appellant, M.L.B., Sr.

                             _____

                             DAVID R. FARMER, JUDGE